IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| General Information Services, Inc., | ) | C/A No. 3:08-324-CMC |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| v. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| LP Software, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter was before the court for a trial without a jury beginning April 27, 2009, and ending April 29, 2009. Having considered the testimony of Ray Conrad, Albert Bueno, Matthew Robbins, and Brian Eskra, the depositions of Michelle Michael and Debbie White, the exhibits, and the arguments, the court now reaches the following findings of fact and conclusions of law. To the extent that the court's statements regarding either facts or law may be considered in the other category, then the conclusions remain those of this court in the appropriate category.

## **FINDINGS OF FACT**

1.      Plaintiff General Information Services, Inc. ("GIS") provides employee background checks for employers in many industries. GIS conducts criminal background checks and compiles information available from public sources, such as addresses, Social Security numbers, and birth records.

2.      Defendant LP Software ("LPS") develops software programs for the retail industry.

3.      GIS and LPS entered into an Agreement on March 30, 2004, for the purpose of creating "a retail theft database that will be utilized by retailers across the United States." GIS purported to terminate the Agreement on November 27, 2007.

4.      GIS brought a declaratory judgment action against LPS seeking "an order striking

the inconsistent, conflicting portion of the On Going Costs section of the Agreement, declaring that . . . GIS lawfully terminated the Agreement and that LPS receive no further payment from GIS."

5.      LPS counterclaimed against GIS asserting a breach of contract claim. LPS alleged that it "has received only part of the payments due to it under the contract terms" and requested damages, including a determination of future earnings, with pre-judgment interest and costs.

6.      Prior to 2004, at least two of GIS's national competitors offered a service that GIS did not provide -- a retail theft database. The service allows retail store employers to gain information about their employees' or prospective employees' involvement in workplace theft. GIS's competitors compiled this information from incident reports by retail establishments of employee dishonesty. The incident reports typically arise from dishonest acts of employees that are investigated and dealt with by employers, but do not result in a criminal record. For example, an employer discovers that an employee is pilfering merchandise or improperly submitting rebate coupons. The employer creates a record of the incident, and terminates the employee, but does not press criminal charges. Prospective employers would not discover that information in a standard criminal background search. GIS recognized that retail stores were interested in this information, and in 2003, GIS decided to develop its own database capturing incidents of employee theft. Once developed, GIS could provide the results of a search in this database as an additional product for its customers. The business that resulted from the development of the database was named the "National Retail Mutual Association," or "NRMA."

7.      To spearhead this endeavor, GIS hired Bob Ralicki, a former manager of a theft database business for USIS, one of GIS's national competitors. Mr. Ralicki was hired in late 2003. From that time until his death in December 2005, Mr. Ralicki was the person responsible for

creating and implementing NRMA. In the summer of 2004, Mr. Ralicki hired a former USIS employee, Debbie White, to run the operations side of the theft database business.

8. Soon after he was hired by GIS, Mr. Ralicki approached Defendant LPS to assist in the enterprise. Mr. Ralicki had previously worked with LPS when he managed the similar enterprise for USIS. He knew that LPS developed software programs for the retail industry, and that LPS's standard software package included logging employee theft incidents. Mr. Ralicki discussed LPS's participation in NRMA with Brian Eskra, President of LPS.

9. For more than two months, GIS and LPS negotiated the terms of a contract. The negotiation process included at least four written communications, as well as one face-to-face meeting. Mr. Ralicki served as the principal spokesman for GIS, and he dealt primarily with Mr. Eskra at LPS. As part of those discussions, GIS rejected LPS's suggestion that LPS receive payment based upon the number of incidents[1] submitted to the NRMA database. Mr. Ralicki rejected that suggestion because of concern that the initial collection of incidents might never result in a viable and marketable product.

10. Instead of focusing upon incidents contributed to the database, the parties agreed that GIS would pay LPS for every search conducted in NRMA. LPS would not receive payment, except certain initial one-time fees outlined in the contract, unless and until the theft database was operational.

11. GIS and LPS ultimately reached a written agreement. The contract was not drafted with the assistance of attorneys. Drafts of the contract were printed on LPS letterhead, but the final

---

[1] An "incident" is the identification of a dishonest act performed by an employee or prior employee of a retail store that is supported by sufficient detail and verification to allow GIS to share the information and to allow a potential employer to rely upon that information.

3

contract was not printed on any letterhead. LPS signed the contract on March 30, 2004, and then forwarded it to Bob Ralicki to have it executed by GIS. The contract was signed by Ray Conrad on behalf of GIS on May 17, 2004. Neither GIS nor LPS waited for that final signature to begin performing under the contract. The version of the "On Going Costs" section included in the final contract was last revised by Bob Ralicki of GIS.

12. The contract provided for three distinct elements. First, in exchange for $500, LPS was to create a standard import format for GIS to provide to retailers. Second, in exchange for $12,000, LPS was to create an extract program for GIS to use with any customer, whether they used LPS software or not, to read and transmit incident data from the retail customer directly to GIS. Those two elements of the contract were completed by March 31, 2004. The third element is described in the contract as "an on-going working partnership" and requires GIS to pay LPS either 15 or 20 cents for searches in the NRMA database.

13. The NRMA database was created and went "live" in April 2005. The first customer to conduct a search in NRMA was Gap, Inc. in April 2005. Prior to April 2005, retail stores submitted incident reports to the database but did not conduct any searches.

14. LPS assisted GIS in establishing NRMA and addressing the issues that arose as new customers joined NRMA.

15. The principal controversy in this case stems from the construction of the final paragraph of the contract, entitled "On Going Costs," which provides:

> In order for LP Software to create an on-going working partnership, LP Software will receive .20 cents per individual screened for theft database inquiries or for other ancillary employment-related inquiries, whichever occurs first as a result of existing or new business developed and/or referred by LP Software. LP Software to provide a current customer list to AIS. LP Software will receive .15 cents per individual screened for theft data base inquiries only for those retailers that are

4

> current GIS and/or AIS customer/clients already utilizing ancillary employment related screening services. A customer/ client list to be provided to LP Software by GIS/ AIS with an effective date of April 1, 2004. LP Software will receive .15 cents per individual screened for theft database inquiries or for other ancillary employment-related inquiries, which ever occurs first as a result of new business developed that had/has no previous association or business dealing's with either GIS/ AIS or LP Software.

16.     The On Going Costs section addresses three categories of customers. "Category A" includes customers who were LPS customers prior to April 1, 2004, or who were brought by LPS to NRMA after April 1, 2004. "Category B" customers were customers of GIS prior to April 1, 2004. Finally, new customers who joined NRMA with no previous association or business dealings with either GIS or LPS are grouped in "Category C." The contract provides that the payment owed by GIS to LPS for NRMA screenings is dependent upon the category of the retail customer. For customers in Category A, GIS owed LPS a payment of 20 cents per search in NRMA. For customers in Category B and C, GIS owed LPS a payment of 15 cents per search.

17.     GIS and LPS disagree as to the meaning of the On Going Costs section. GIS maintains that it only owes LPS a fee of 15 or 20 cents when three conditions are satisfied: (1) the customer searching NRMA is a mutual customer, meaning that the customer uses LPS software to submit incidents to NRMA; (2) GIS billed the customer for NRMA searches; and (3) the customer searching NRMA is not a member of the NRMA advisory board. On the other hand, LPS contends that GIS owes a fee of 15 or 20 cents for every search conducted in the NRMA database, even if the customer does not use LPS software to submit incidents, the customer is not billed separately for NRMA, and the customer is a member of the advisory board.

18.     To identify which customers belonged in each category, the On Going Costs section of the contract provided that GIS and LPS exchange a list of their current customers, which the

parties did in April 2004. Based upon the exchange of those initial lists, the court finds that the following LPS customers, which are Category A customers, have searched NRMA: (1) Brookstone; (2) Gamestop; (3) HMS Host; (4) Movie Gallery; (5) Neiman Marcus; (6) New York and Co. (Lerner New York); and (7) Sports Authority. When LPS's and GIS's customer lists are compared, there are several customers (including Gap, Inc. and Aarons Rentals) on both lists. LPS agrees that these customers fall into Category B because they were pre-existing customers of GIS.

19.     In addition to those seven customers identified from the initial lists, LPS also brought the following customers to NRMA: (1) Anna's Linens; (2) Charlotte Russe; (3) Charming Shoppes, Inc.; and (4) Sterling Jewelers. These customers also fall into Category A.

20.     The parties dispute whether the Kroger Company is a Category A or Category C customer. Kroger was not on either customer list exchanged in April 2004 because neither party had a contractual relationship with Kroger at that time. By the spring of 2005, LPS had sold its software program to Kroger and included Kroger on its updated Customer List dated February 24, 2005. The initial communication between Kroger and GIS was set up by Mr. Eskra of LPS. That initial introduction was followed by a meeting on November 22, 2004, which LPS joined by telephone. Mr. Ralicki's notes of that meeting included that, "When we get down to providing numbers/pricing we need to include .20 for LPS Software in the overall package . . . ." LPS was also active in helping GIS sell its other screening services to Kroger. In June 2005, Kroger included GIS on its broad request for proposals ("RFP"). In its response to the RFP, GIS submitted a detailed account of its services and included at least six references to NRMA, concluding with the encouragement that Kroger should accept a package that included NRMA and participate in submitting incidents to build up the database. When Kroger asked GIS for a conference to review the response to the

6

RFP, GIS asked Mr. Eskra to join the meeting in Cincinnati, Ohio, which he did on September 15, 2005. Two weeks later, Mr. Ralicki wrote to Mr. Eskra claiming, "We got it!!!!!!!!!  100% of Kroger business, includes NRMA." Further, after Kroger joined NRMA, GIS agreed to pay LPS a Kroger "partner fee" of 20 cents per search and in fact has paid LPS $51,278.00. The court accordingly finds that Kroger falls into Category A.

21.     In an email written 18 months after the contract was signed, Ray Conrad (CEO of GIS) suggested that the arrangement with LPS was going to cost him "a fortune." Mr. Ralicki of GIS responded that he was not aware of any failure by LPS to perform its obligations under the contract. Further, Debbie White testified in her deposition that she had never heard any suggestion or complaint that LPS was not living up to its end of the agreement.

22.     Albert Bueno, President of GIS, testified that LPS had a duty to market NRMA and that LPS breached the contract by not marketing NRMA. He was cross-examined on this issue and ultimately conceded that there were numerous instances of marketing efforts by LPS of which he was not aware. The evidence and testimony presented at trial showed that LPS made an effort to introduce current and potential customers to NRMA and GIS. Many of LPS's marketing activities are reflected in written communications and include, for example, LPS circulating a NRMA flyer to some of its clients and arranging for GIS to attend its annual training seminar to make a presentation. Therefore, Albert Bueno's testimony that GIS breached the contract or failed to conform to the contract because LPS did not market NRMA is inconsistent with not only the contract, which does not require marketing, but with what actually occurred.

23.     As an indication of LPS's efforts to build and promote NRMA, the following companies that were initially customers of LPS subsequently became customers of NRMA: (1) Gamestop Corp.; (2) Charming Shoppes, Inc.; (3) Sterling Jewelers, Inc.; (4) The Neiman Marcus

7

Group, Inc.; (5) HMS Host Corporation; (6) Movie Gallery, Inc.; (7) The Sports Authority, Inc.; (8) New York & Company, Inc.; (9) Brookstone, Inc.; (10) Anna's Linens Company; and (11) Charlotte Russe. Although Kroger was not initially a customer of LPS, LPS was critical in obtaining Kroger's participation in NRMA. According to the information provided by GIS, which is current through March 31, 2009, these 11 customers and Kroger searched NRMA 1,543,447 times. A review of data as to those 12 customers (11 companies and Kroger) reflects that forty-one percent of all searches in NRMA were conducted by customers who first had a relationship with LPS.

24. GIS contends that it has not billed for most of the NRMA searches. GIS has, however, billed customers for other services and has also included NRMA in package deals for which they have billed. GIS has earned revenue from NRMA even when NRMA services were not billed as a separate line item. Further, GIS has increased the size and value of NRMA by requiring that all customers submit incidents to NRMA.

25. Through February 28, 2009, GIS has billed Kroger $9,305,058, HMS Host $817,136, and Gamestop $486,303.

26. GIS bills for searches in NRMA in three ways. First, GIS sometimes bills searches of NRMA as a line item, usually at a price of $1.75 per search. Second, GIS bills customers for package deals which include NRMA. For example, GIS billed Kroger $2.75 for any search of a package which includes social security number, name and address, NRMA, KWIK and OFAC & SOR. Third, for some customers, particularly those who signed up early and agreed to serve on the NRMA advisory board, GIS does not bill for a NRMA search as long as the customers are regularly submitting incidents to NRMA and are active on the advisory board.

27. GIS created a NRMA advisory board with representatives of some of GIS's

8

customers, including a representative of LPS. GIS created the advisory board to entice these customers (1) to participate in NRMA by contributing incidents to the database and (2) to recommend NRMA to other retail companies. In exchange for their service on the advisory board, GIS provided free searches in NRMA for a period of time. A representative of LPS, typically Mr. Eskra, attended most of the NRMA advisory board meetings and knew that GIS had extended an offer of free access to NRMA to the advisory board members. LPS contends that the offer was limited to one year after the creation of NRMA in March 2004. Mr. Conrad testified that the original offer to the advisory board members expired in March 2005. However, due to the small number of incidents in NRMA, GIS extended the offer beyond March 2005. An announcement was sent to "All members" of NRMA in December 2006 that "NRMA will begin charging for access to the NRMA retail theft database at a rate of $1.75." Def. Exh. 171. Albert Bueno, President of GIS, testified that this announcement was not directed to advisory board members because advisory board members understood they were never to be charged for searches in NRMA.

  28.  The earliest evidence of a dispute over the contract is an email dated October 30, 2005, when Mr. Conrad responded to an e-mail between Mr. Ralicki and Mr. Eskra, on which he had been copied. In that e-mail, Mr. Conrad noted that the contract as written was going to cost him "a fortune." He instructed Mr. Ralicki to re-negotiate the contract terms. Mr. Ralicki died in early December 2005 before this was addressed. Instead, Mr. Bueno, who earlier had little involvement with NRMA and LPS, began the process of re-negotiating the contract as directed by Mr. Conrad. That process is reflected in several e-mails exchanged in February and March 2006. No new contract or modification was agreed upon. Mr. Bueno simply said that he was going to pay LPS for NRMA searches by Kroger only. Even that commitment was changed when in August 2007, Mr. Bueno told Mr. Eskra that the Kroger partner fees would be terminated, effective the end of the prior

February. The fact that GIS sent LPS a new "term sheet" on September 25, 2007, is further evidence that GIS knew LPS had not agreed to change the original contract terms. LPS rejected that term sheet. In an e-mail dated October 10, 2007, Mr. Eskra reminded Matt Robbins that, "we have an agreement currently in force that was signed by Ray."

29. Although the contract is silent as to termination, the contract does refer to an "on-going working partnership." The discussions between the parties prior to the signing of the contract reflected a similar theme of long-term expectations. The communications from GIS to the members of the advisory board repeatedly referred to LPS as its "strategic partner." The parties agreed that the potential for significant payments to LPS would come only after a long investment of time and energy by both GIS and LPS. The work that was invested by LPS was anticipated by Mr. Ralicki when he explained to Mr. Conrad that LPS was willing invest in the enterprise by doing "missionary work." In fact, the evidence shows that in April 2004, LPS started investing significant time and energy on NRMA, and LPS did not receive its first payment from GIS until June 2006.

30. GIS provided an accounting which reflects each search of NRMA since it became active in April 2005. From this accounting, the number of searches by each customer is readily discernable. The accounting is current through March 31, 2009. NRMA continues to receive new incidents and to be searched by GIS's customers.

31. GIS has made some payments owed to LPS under the contract. GIS has paid LPS "Kroger partner fees" for March 1, 2006, through February 28, 2007, in the amount of $51,278.

## CONCLUSIONS OF LAW

A.    GIS's request for declaratory judgment is denied.

10

      B.      LPS's counterclaim for damages with prejudgment interests and costs is granted.

      C.      **Breach of Contract** - This action for declaratory judgment requires that the court interpret the On Going Costs section of the contract and determine whether GIS's attempted termination was valid. LPS's counterclaim for damages alleges breach of contract. To recover for breach of contract, LPS must establish three elements by a preponderance of the evidence: (1) a binding contract; (2) a breach of contract; and (3) damage suffered by LPS as a direct and proximate result of the breach. *Fuller v. Eastern Fire & Casualty Ins. Co.*, 240 S.C. 75, 89 (1962).

      D.      **Valid Contract** - Neither party disputes the existence of a binding contract. The contract between GIS and LPS was signed by LPS and GIS on March 30, 2004 and May 17, 2004, respectively. There was a meeting of the minds on all terms, and the contract was supported by valuable consideration. The contract was negotiated by Mr. Eskra, on behalf of LPS, and Mr. Ralicki, for GIS. The On Going Costs section of the contract was last revised by Mr. Ralicki of GIS.

      E.      **Contractual Duties Owed** - The parties dispute what duties were owed under the contract. LPS alleges that GIS has a duty to make payments to LPS pursuant to the On Going Costs section of the contract and that GIS failed to make those payments when due. In response, GIS argues that payments are not owed to the extent LPS maintains. Further, GIS argues that the contract imposed on LPS a duty to market NRMA and that LPS breached that duty. According to GIS, LPS's breach of its duty to market provided GIS with a right to terminate the contract on November 27, 2007, and therefore avoid payment for NRMA searches after that date.

      F.      **Contract Interpretation** - The paramount rule of contract construction is to "ascertain and give effect to the intent of the parties as determined from the whole document." *S.C. Dep't of Natural Resources v. Town of McClellanville*, 345 S.C. 617, 622 (2001). "Parties are governed by their outward expressions and the court is not at liberty to consider their secret

11

intentions." *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 498 (Ct. App. 2007). Contract interpretation is "governed by the objective manifestation of the parties' assent at the time the contract was made." *Bannon v. Knauss*, 282 S.C. 589, 593 (Ct. App. 1984). "It does not depend on the subjective, after the fact meaning one party assigns to it." *Id.* To determine the intention of a contract, the court must first look to the language of the contract. *Ecclesiastes*, 374 S.C. at 498. If the contract is plain, unambiguous, and "capable of only one reasonable interpretation, no construction is required and its language determines the instrument's force and effect." *Id.* at 499. On the other hand, if the agreement is ambiguous, the court should search for the parties' intent. *Id.* A contract is ambiguous when the terms of the contract are reasonably susceptible to more than one interpretation or when its meaning is unclear. *S.C. Dep't. of Natural Resources*, 345 S.C. at 622. A court must determine whether a contract is ambiguous by examining the entire contract and not just isolated portions of the contract. *Farr v. Duke Power Co., Inc.*, 265 S.C. 356 (1975). If the contract is ambiguous, extrinsic evidence may be admitted to show the intent of the parties. *S.C. Dep't. of Natural Resources*, 345 S.C. at 622. If the contract is unambiguous, extrinsic evidence may not be admitted and the contract must be enforced according to its terms. *Id.*

      G.    **Unambiguous Contract** - The court finds that the On Going Costs section of the contract is unambiguous. The intent of the parties is clear from the words of the Agreement and the court must enforce the contract according to its terms.

      H.    **No Duty to Market** - The court finds that LPS did not breach the contract. There was no duty to market by LPS contained in the contract. Neither was there an agreement subsequent

to the contract that imposed such a duty. Despite the lack of a duty to market, the court finds that LPS did make a meaningful effort to market NRMA to its current and potential customers.

I. **On Going Costs Section** - The court finds that LPS's interpretation of GIS's duty to make payments pursuant to the On Going Costs section of the contract is the correct interpretation, as intended by the parties. The On Going Costs section is susceptible to only one reasonable interpretation -- that the parties agreed that LPS would receive payments of either 15 or 20 cents each time there was a search of NRMA. To hold otherwise, the court would be required to rewrite the terms of the contract. Courts cannot read words into a contract that impart a wholly unexpressed intent than when the contract was executed. *See McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204 (1945). There is no question that the terms of the contract require GIS to pay LPS a significant amount of money. GIS negotiated the contract and agreed to its terms, including the On Going Costs section. GIS's failure to make payments to LPS pursuant to the On Going Costs section was a breach of contract.

J. **Three Conditions to Payment** - GIS argues that the On Going Costs section was subject to three conditions. Those three conditions were neither included in the express terms of that section nor added by oral modification. Even if the court were to find the On Going Costs section of the contract ambiguous and were to consider extrinsic evidence, other evidence confirms the intent of the parties as set out in the language of the contract. Extrinsic evidence shows that the parties intended that LPS receive payments of either 15 or 20 cents each time there was a search of NRMA. GIS's duty to pay was not limited to those searches which satisfied three conditions: (1) the customer searching NRMA was a mutual customer, meaning that the customer used LPS software to submit incidents to NRMA; (2) GIS billed the customer for the NRMA search; and (3)

13

the customer searching NRMA was not a member of the advisory board. With respect to these three conditions, the court finds that Mr. Conrad's testimony was not credible. After considering Mr. Conrad's October 2005 e-mail to Mr. Ralicki and his trial testimony, the court finds that Mr. Conrad's e-mail comment on the On Going Costs section of the contract is entirely consistent with LPS's interpretation of the contract and inconsistent with his trial testimony. The three conditions were never mentioned in Mr. Conrad's email when he recognized that payments owed under the contract would be substantial. Rather, the conditions appeared when GIS attempted to renegotiate the terms of the contract, but they were not reflected in the contract signed by the parties.

K.  **Mutual Customers** - GIS's payment obligation was not conditioned on the customer using LPS software to submit incidents. Prior drafts of the contract specifically show that a requirement that the customer use LPS software to submit incidents before LPS receive payment was discussed, then rejected, and not incorporated in the final contract. The On Going Costs section simply does not require that customers use LPS software to submit incidents to NRMA in order for LPS to receive a payment for NRMA searches. Moreover, when the court questioned GIS's counsel during his closing argument about the mutual customer requirement, he conceded that a Category A customer need not use LPS software to be considered a mutual customer. This response represented a different argument than that presented by GIS during this trial. Although Mr. Eskra's August 2007 e-mails refer to payments for NRMA searches by customers using LPS software, the court questioned Mr. Eskra on the position he articulated in this email.[2] He responded that he knew he was at least owed payment for these customers and that these statements were made well after

---

[2] In one email, Mr. Eskra stated that, "In our agreement, we are to receive payments (at a lower rate) for all NRMA clients using LPMS." Pl. Exh. 27.

14

the contract was drafted in an attempt to collect some form of payment from GIS, which was not willing to pay at all. The court found his answer credible and in no way an interpretation of the On Going Costs section of the contract. GIS owes LPS a 15 or 20-cent fee for every search in NRMA, regardless of what software, if any, was used by the customer to submit incidents to NRMA.

      L.    **Billing Structure** - Likewise, the responsibility for making payments by GIS was not limited to those searches for which GIS directly billed a customer for NRMA. GIS had the option to offer enticement to a potential customer to persuade the customer to submit incidents and expand NRMA. GIS's decision to offer free searches to its customers does not alter GIS's agreement with LPS, which requires GIS to pay LPS for all searches in NRMA. Although GIS suggests that it would be unfair to assess it 15 or 20 cents for these "free" searches, the court is not persuaded. LPS is owed a 15 or 20-cent fee for NRMA searches regardless of whether GIS charged the customer for a NRMA search separately (as a line item) or whether the search was included in a package offered by GIS at a fixed rate. LPS is also owed a fee for searches that GIS contends are "test cases," as there is no indication that test searches were to be excluded from the payment structure in the On Going Costs section.

      M.    **Advisory Board** - Nothing in the contract excepts GIS from having to pay for searches performed by members of the advisory board. GIS has failed to prove that an agreement subsequent to the contract was reached to exclude searches by advisory board members from the On Going Costs payment structure. While LPS may have been aware of GIS's decision not to charge members of the advisory board, its entitlement to be paid was not altered *See Florence City-County Airport Comm'n v. Air Terminal Parking Co.*, 283 S.C. 337, 341 (Ct. App. 1984) (an offeree's silence is not an acceptance or acquiescence to the proposed change).

15

N.     **Termination Ineffective** - GIS argues that LPS's breach of its duty to market provided GIS with a right to terminate the contract. As stated above, LPS had no duty to market NRMA. The court finds that there was no breach of contract by LPS which gave rise to a right of termination by GIS, and the purported termination, therefore, was ineffective. The contract contained no termination clause. In the absence of express agreement, South Carolina law requires that a party provide reasonable notice of its intention to terminate a contract. *See Carolina Cable Network v. Alert Cable TV, Inc.*, 316 S.C. 98, 102 (1994). GIS gave no notice to LPS, but instead sent a letter purporting to terminate the contract effective immediately. Although the reasonableness of notice of termination is dependent on the facts of each case and the nature and circumstances of the contract involved, lack of notice is unreasonable under any set of circumstances. *Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 203 (6th Cir. 1986) ("The determination concerning what constitutes reasonable notice, however, is a fact-specific inquiry dependent upon the length of the contractual relationship between the parties, the reliance which either party has placed upon the continuing vitality of the contractual relationship, the particular business involved, and the practices and customs in the industry."). Because the parties anticipated a "long term partnership," and GIS considered LPS its "strategic partner," any attempt at termination would certainly entail a significant notice period. Under this contract, the court concludes that two years notice is reasonable, as long as customers continue to search NRMA during that time.[3] Even then, the merits of any such

---

[3] Allowing the contract to continue two years after reasonable notice by GIS of its intent to terminate the contract is entirely consistent with the case law from other jurisdictions where courts have determined what contract duration would be reasonable based on the nature and circumstances of the undertaking. *See Weaver v. Schartiger*, Civil No. CCB-04-CV-656, 2007 U.S. Dist. LEXIS 21330, *9 (D. Md. March 23, 2007) (implying a three-year relationship between the parties where the contract stated and the parties agreed that their association was to be "continuous"); *Kiley v. First Nat'l Bank of Maryland*, 649 A.2d 1149 (Md. Ct. App. 1994) (finding a contract duration of

16

termination would be measured by the standards of good faith and fair dealing. *See Shiftlet v. Allstate Ins. Co.*, 279 S.C. 336 (1983) (noting that every contract contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement); *see also deTreville v. Outboard Marine Corp.*, 439 F.2d 1099, 1100 (4th Cir. 1971) (party terminating a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience).

O.      **Payments Based on Category** - After concluding that GIS breached its duty to make payments to LPS according to the terms of the On Going Costs section, the court must determine which customers fall into which categories. GIS owes LPS a 20-cent payment for every NRMA search conducted by customers in Category A and a 15-cent payment for every NRMA search conducted by customers in Category B and C.

P.      **Customer Categories** - The following companies fall into Category A of the On Going Costs section: (1) Anna's Linens; (2) Brookstone; (3) Charlotte Russe; (4) Charming Shoppes, Inc.; (5) Gamestop; (6) HMSHost Corporation; (7) Movie Gallery; (8) Neiman Marcus; (9) New York and Company; (10) Sports Authority; (11) Sterling Jewelers; and (12) the Kroger Company.[4] All remaining customers of GIS utilizing NRMA fall into Category B and C.

Q.      **Damages** - Having reached the conclusion that LPS is entitled to be paid according to the contract provisions, using the accounting provided by GIS, and giving credit for payments

---

five years to be reasonable for agreement between depositor and bank that lacked a duration clause).

[4] The court recited above in Paragraph 20 the history of communications and negotiations involving the Kroger Company, which eventually moved all of its employee background search business to GIS. The court concludes, as did GIS when it started making initial payments, that LPS is entitled to 20 cents for each NRMA search by Kroger because it falls into Category A.

actually made by GIS, the court concludes that the amount owed by GIS to LPS on its counterclaim for searches as of March 31, 2009, is $582,892.35. The figures that the court considered in arriving at that conclusion are the following:

**Number of NRMA Searches:**

•84 businesses searched NRMA and conducted 3,713,320 searches on NRMA through March 31, 2009.

•12 business, which conducted 1,543,447 searches, are Category A customers:

| | | |
|---|---|---|
| 1. | Anna's Linens | 12,361 |
| 2. | Brookstone | 13,239 |
| 3. | Charlotte Russe | 3,596 |
| 4. | Charming Shoppes, Inc. | 180 |
| 5. | Gamestop | 35,034 |
| 6. | HMSHost Corporation | 1,382 |
| 7. | Movie Gallery | 278,774 |
| 8. | Neiman Marcus | 21,780 |
| 9. | New York and Company | 65,030 |
| 10. | Sports Authority | 275,588 |
| 11. | Sterling Jewelers | 80 |
| 12. | Kroger | 836,403 |
| | TOTAL Category A Searches | 1,543,447 |

•72 businesses, which conducted 2,169,873 searches, are Category B & C customers.

**Fees Owed for Searches:**

•Category A - 1,543,447 searches @ 20¢ per search................$308,689.40

•Category B - 2,169,873 searches @ 15¢ per search................$325,480.95

•Amount Paid by GIS as Partner Fees for Kroger....................($51,278.00)

•Balance due to LPS for NRMA searches as of 3/31/2009......**$582,892.35**

R.      **Pre-Judgment Interest** - In addition to entry of judgment on the counterclaim in the amount of $582,892.35, the court concludes that LPS is entitled to recover pre-judgment interest

18

at a rate of eight and three-fourths percent (8.75%) per annum from the time payments should have been paid until entry of judgment. S.C. Code Ann. §34-31-20; *see Liberty Mut. Ins. Co. v. Employer Res. Mgmt., Inc.*, 176 F. Supp. 2d 510, 540 (D.S.C. 2001) ("The law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, payment is demandable, if the sum due is certain or capable of being reduced to certainty."). The court calculates prejudgment interest based upon GIS's statement reflected in an October 28, 2005, e-mail that payments would be made to LPS on a quarterly basis. Pl. Exh. 14. The prejudgment interest calculation is based on an initial payment for searches before October 31, 2005, and at the end of each calendar quarter thereafter. Payment was due 30 days after the end of each period. The court's calculation of the amount due includes all periods through March 31, 2009. The court credits GIS for the amount previously paid for Kroger ($51,278.00). The amount of pre-judgment interest is $68,027.77. This total has allowed a credit for interest at 8.75% per annum until May 31, 2009, on all payments made for Kroger partner fees. The per diem rate from that date to the date of entry of judgment is $139.73. The court relies on LPS's calculations for prejudgment interest. After providing an opportunity for GIS to object to these calculations, and after receiving no objection, the court adopts LPS's calculations as its own.

S.   **Future Obligations** - The court concludes that the contract as written and as interpreted by the court is in effect until two years pass from the date GIS gives reasonable notice of its intent to terminate the contract. GIS owes LPS payments for each NRMA database search at either 15 or 20 cents as determined in Paragraph Q above. Beginning with the calendar quarter ending June 30, 2009, GIS will provide to LPS, within 30 days of the end of the quarter, both an accounting similar to that provided in Trial Exhibit 119 and a payment reflecting either 15 or 20

cents for each search, along with an explanation of how the calculation was made. That process of quarterly accounting and payment shall continue as long as the contract between the parties remains in effect.

## CONCLUSION

It is, therefore, ordered that judgment be entered against General Information Services, Inc. on its claim for declaratory judgment and in favor of LP Software, Inc. on its counterclaim against General Information Services, Inc. in the amount of $582,892.35 plus pre-judgment interest in the amount of $68,027.77 through May 31, 2009, and $139.73 per day from June 1, 2009 through date of entry of judgment. Further, the parties are directed to abide by the Order of this court with respect to future liabilities and payments.

**IT IS SO ORDERED.**

 s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 18, 2009